Hitchcock, J.
The facts of this case are substantially as follows : On April 3, 1816, a written contract was entered into between Levi Barber and Samuel Scott, by which Barber agreed to sell Scott 640 acres of land in Athens county, for the sum of $1,000 ; $320 to be paid in hand, $333 in one year, and $347 in two years, without interest; Scott also to pay the taxes. Upon the payment of the purchase money, *the land to be conveyed. The first payment was made, and much the largest proportion of the second; but no part of the last payment was made previous to the death of Scott, which took place in August, 1818, nor has any jiayment been made since. The complainant, Samuel Scott, was born about four months after the death of his father.
Abraham Scott, a brother of Samuel the elder, took possession ■of the land soon after the purchase, made some small improvements, and continued in possession until 1826, when he leased the .same by parcel to one Joseph Kirgan, for twelve years, at an annual rent of fifteen bushels of corn. Rirgantook possession, and ■made some additional improvements, but refused to pay the rent, •because the land belonged to Barber, who told him that Scott, *551 had forfeited his interest. Samuel Scott himself was never in possession of the land.
On December 24, 1820, Abraham Scott, father of Samuel Scott the elder, wrote from Greene county, Pennsylvania, to Barber, that about four years before, he had left more than $500 with his son Samuel, to purchase a section of land of Barber, which was purchased at $1,000, and which, he states, he intended to divide among his sons. After stating that Samuel is dead, he requests Barber to inform him what is due for the land, and inquires whether whisky or any other produce will be received in payment, and says if it can, then he will try to mako payment. He wishes the deed made to himself, otherwise he shall have to look to Samuel’s estate for the money which he left with him, and for which he has his receipt.
On the 10th of January thereafter, Barber answered this letter. In this letter, Barber refers to a letter which he had written, in 1819, to Joseph Scott, supposed to bo a brother of Samuel, in which he had stated the terms of sale, the amount actually paid, and the balance due, and gives an extract from that letter. Ho says ho is willing to give to Abraham Scott a deed, provided he will produce the contract, and the administrators agree to it; but informs him that the balance due must be paid in money.
*On December 22, 1823, Barber again wrote to Abraham Scott, calling his attention to the subject, urging him to do something, and informing him that the business must not remain in that situation ; that the taxes had not been paid; that the land had been advertised for sale, and that he had purchased it in for the taxes of 1820, ’21, and ’22. To this letter Barber received no answer, nor is there anything to show that he heard from Abraham Scott, after the letter of December 30, 1820.
On March 5,1824, Barber wrote to the widow of Samuel Scott — • she then residing near Chillicothe. In this letter, he informs her of the sale of the land to her husband; that more than half the purobase money was paid, and urges her to have the business settled ; inquires of her whether Samuel left any heir or heirs; what are their names; whether there was any administrator on his estate, and if any, inquires the name. He informs her that if Samuel had an heir or administrator, they ought to attend to it immediately, otherwise that what had been paid would be saeri *552 fieed. It does not appear that any answer was returned to this letter.
Joseph Kirgan, a witness for coihplainan.t, states that, in 1831, he 'applied to Barber to purchase a part of the land, and that Barber refused to sell, because he understood that Scott had left an heir, but informed him that if that heir failed to redeem, when he came of age, he would then sell to him, Kirgan.
William Brown, a witness for defendants, states that Joseph Scott, uncle of complainant, and brother of Samuel the elder, in the summer of 1818, made a visit to this part of the country, and had conversation with him about this land. Joseph represented that it was bought by his father; that his father’s affairs had become so deranged that he could not pay for it, and he thought none of the sons would pay for it, unless it was Samuel, and that Samuel would. The next summer, that is, the summer of 1819, a brother of complainant’s mother came to look at the land. Witness had conversation with him. He said he was going to see the land, to determine whether it *would be for the interest of complainant, who was then an infant, to take his money and complete the payment for the land, or to put it at interest; and witness thinks that he came to the conclusion it would be best to abandon the land, and put the money at interest; but is not certain as to this. At any rate, witness thought, at the time, such course would be for the interest of complainant.
It was agreed by complainant’s counsel, that, at the time complainant commenced the suit, he was a minor, and destitute of property; that ho received none from his father’s estate, and expected none except this land; that Elmore Armstrong, who prosecuted, as next friend, expected to be liable for all costs and expenses, and for the purchase money still due; that he was to bo remunerated out of the land, according to a verbal agreement between him and the infant; but there was no writing between them.
Levi Barber paid the taxes on the land from the year 1820 to the time of his death, With the exception of the year 1831, when they were paid by^Kirgan. Those holding under him had the possession from 1826. He died in 1833. The proof shows that the land depreciated in value from' the year 1819 until 1832 or 1833, and was hardly worth the amount due upon it, with the taxes and interest. After that period, it increased in value, and at the time *553 the original bill was filed, to wit, July 6,1839, was supposed to be worth $3,000. Since that time, it has again depreciated.
The defendants resisted a decree, on the ground that the contract had been abandoned, and on account of the staleness of the equity.
In consideration of the foregoing facts, the court dismissed the bill, and the question now raised is, whether, in so dismissing it, there was error.
In this bill of review, it is alleged, first, that the court erred in not decreeing a specific performance of the contract; second, it was not erroneous to refuse a decree for a specific performance; then the court .erred in not decreeing that , the purchase money should be refunded.
*It will be seen by the facts before stated, that the last installment to be paid for the land in controversy fell due in April, 1818, and that from that time to the filing of the bill, on July 6, 1839, a period of more than twenty-one years, no offer to pay was made. From 1820 no taxes wore paid. From 1826 no person was in possession, acknowledging any other right to the land than the right of Barber. In truth, Samuel Scott the elder was never in possession, although his brother Abraham was until 1826, but he took no steps to perform the contract; he did not even pay any tax. Under such circumstances, had Samuel Scott the elder lived, and had he filed this bill, I presume the counsel for complainant will not contend that he would have been entitled to any relief. It would at once have been admitted that the contract had been abandoned, and could not have been enforced. It would have been admitted that the lapse of time was so great that equity' could not, with propriety, interfere.
But it is claimed that, inasmuch as the complainant was an infant, circumstances ought not to operate against him. It must be remembered that the default was in the lifetime of the ancestor. Whether any administrator was ever appointed on the estate of Samuel Scott the elder, does not appear, but no guardian was appointed for complainant. Barber, after the death of Scott, corresponded with his relatives, to wit, his father and mother, urging the completion of the contract, but interference on their part is' declined. If not fully proven, yet the presumption is strong that the land was actually purchased by the money, and for the use of Abraham Scott, the father of Samuel the elder. After the death *554 of Samuel, an uncle of the complainant, on the side of his mother, visits the neighborhood, with a view to examine the lands and form an opinion whether it would be for the interest of his infant nephew to complete the payments. Subsequent to this, and in the year 1824, Barber writes to the mother of complainant, his natural guardian, and urges upon her the necessity of having the business brought to a close, stating to her that unless it is done *tho purchase money already paid will be lost. But from December 30,1819, the date of the letter of Abraham Scott to Barber, it does not appear that the latter ever heard one word from any of the friends or connections of the complainant relative to this contract.
Under these circumstances there can be no doubt that Barber might, with propriety, have considered the contract as abandoned, and that a court of equity, on his application, would have decreed its rescission. And taking all these circumstances, in connection with the great lapse of time, into consideration, it seems, to a majority of the court, that there was no error in refusing to decree a specific performance of the contract.
The case of Henry v. Conn et al., 12 Ohio, 193, was not unlike this, and in that case the court held that; where'purchase money becomes due in the lifetime of the vendee, the infancy of his heir will not excuse delay in making payment, so as to induce the court to decree performance against the vendor after a great lapse of time.
But it is said that, although the court may not have erred in refusing a specific performance, still there was error in not decreeing the return of the purchase money. We do not see why, if lapse of time is to be considered a bar for one purpose, it should not for all purposes. It would seem to bo right and proper, in many cases, where a-man has purchased land, and made partial payments, and then fails, that the purchase money should be returned. But I know of no rule of law or equity that will compel the vendor to return it until he has first been put in default, by refusing to comply.with his contract. Now here has been no default on the part of Barber, or those representing him. No offer was made to pay the purchase money until more than twenty-one years after the same fell due. The default has ever been on the side of the vendee and his representatives. Had the vendee or his representatives, within a reasonable time, offered to forfeit the *555, 556 contract, and had Barber refused, then the money already paid might have been recovered back, as having been paid upon a consideration which had ^failed. But within what time? The statute of limitation answers this question. Within six years from the time the cause of action accrued. But in this case the effort is to recover back the money after a lapse of more than twenty-one years, and that, too, without having put the opposite party in default.
In the opinion of a majority of the court, it can not be done, and the bill must be dismissed.